[Cite as *In re B.B.*, 2026-Ohio-1268.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

IN RE: B.B. & R.W.

:      APPEAL NO.   C-250428
          TRIAL NO.    F/16/2192 Z

:

:      *JUDGMENT ENTRY*

:

       This cause was heard upon the appeal, the record, and appellant's brief.

       For the reasons set forth in the Opinion filed this date, the judgment of the trial court is affirmed.

       Further, the court holds that there were reasonable grounds for this appeal, allows no penalty, and orders that costs be taxed under App.R. 24.

       The court further orders that (1) a copy of this Judgment with a copy of the Opinion attached constitutes the mandate, and (2) the mandate be sent to the trial court for execution under App.R. 27.

**To the clerk:**

**Enter upon the journal of the court on 4/8/2026 per order of the court.**

**By:**_____
       **Administrative Judge**

[Cite as *In re B.B.*, 2026-Ohio-1268.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | | |
|---|---|---|---|
| IN RE: B.B. & R.W. | : | APPEAL NO. | C-250428 |
| | | TRIAL NO. | F/16/2192 Z |
| | : | | |
| | : | | |
| | | *O P I N I O N* | |
| | : | | |

Appeal From: Hamilton County Juvenile Court

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: April 8, 2026

*Appellant Mother*, pro se.

**CROUSE, Judge.**

{¶1}   Eight years ago, the Hamilton County Juvenile Court awarded legal custody of B.B. and R.W. to father. The court suspended appellant mother's parenting time three years later, after R.W. suffered an unexplained, serious injury while in her care. The order now on appeal denied mother's motion to regain custody of B.B. and R.W., in which mother contended that father had denied mother parenting time, allowed the children to be injured, and neglected the children's medical care. We conclude that the juvenile court did not abuse its discretion when it found that mother had failed to show changed circumstances that would justify a custody modification. So we affirm.

## I.  BACKGROUND

{¶2}   B.B. and R.W. are the children of mother and father (collectively, "parents"). B.B. was 11 years old and R.W. was 14 years old at the time of the proceedings before the magistrate below. The juvenile court found that "R.W. is diagnosed with autism, is non-verbal, and has cerebral palsy."

### A.  Prior History

{¶3}   The Hamilton County Department of Job and Family Services ("HCJFS") became involved with the family in 2016, after an incident in which mother used a taser on father in a grocery store in front of B.B. Both children were adjudicated "dependent" in January 2017. HCJFS took temporary custody and placed the children with their paternal grandmother. Two years later, father was awarded legal custody with arrangements for parenting time for mother, per agreement.

{¶4}   In March 2020, father filed to terminate mother's parenting time. While that motion was pending, R.W. suffered a traumatic injury while in mother's care, resulting in an orbital fracture around his eye and seizures. Following the incident,

R.W. was hospitalized and placed on a ventilator. The same night, B.B. exhibited bruising on her face. The causes of the children's injuries remain unclear.

{¶5} Following a hearing on father's motion, the magistrate suspended mother's parenting time. The juvenile court approved this order over mother's objections in a December 2021 order, which we affirmed in *Wilfong v. Bush*, 2023-Ohio-1256 (1st Dist.).

### B. January 2025 Hearing

{¶6} Since the magistrate entered the December 2021 order, father has maintained sole legal custody of the children. He has, during much of this period, allowed B.B. and R.W. to stay with mother from time to time—though with decreasing frequency, and not for several months prior to the hearing.

{¶7} In June 2024, mother moved for legal custody of B.B. and R.W. In October, she moved to modify the court's order regarding parenting time. Father did not appear at the January 2025 hearing on these motions. Mother appeared pro se and called two witnesses apart from herself.

{¶8} Mother's first witness was the children's maternal uncle. He testified that he had never met or spoken with B.B. and R.W., but that he did not believe mother to be a bad mother.

{¶9} The second witness was mother's friend and neighbor, who said that she had allowed B.B. and R.W. to play with her grandchildren while B.B. and R.W. were in mother's care. This neighbor testified that mother was a "great mother" and a "Godly person," and that she had never seen the children be aggressive or self-harm while in mother's care.

{¶10} When mother took the stand, she testified about her concerns that B.B. and R.W. were being mistreated, injured, neglected, and/or denied proper medical

care while with father.

{¶11} Some of mother's evidence focused on an incident in November 2023, when R.W. apparently became aggressive with paternal grandmother and B.B. Mother was contacted, and mother, in turn, called 9-1-1. When officers arrived, R.W. was calm and the officers were told that he would be taken to Cincinnati Children's Hospital. Mother introduced a police report of that incident.

{¶12} Mother also introduced a police report detailing an incident on June 14, 2024, during which B.B. refused to leave with father. Given father's legal custody, this created an issue. Mother called the police and all parties eventually agreed that B.B. could go home with paternal grandmother.

{¶13} Mother offered other evidence and testimony that, when mother had received B.B. and R.W. from father, mother had sometimes noticed small injuries and wounds. The injuries included what mother referred to as burn marks on R.W.'s chest, back, and wrist, as well as wounds on R.W.'s arms and legs. She also described a "knot" on R.W.'s head and marks behind R.W.'s ears. Mother submitted photographs of these injuries. Mother further averred that she had found fecal matter in R.W.'s hair and on his person. She introduced photos allegedly showing this.

{¶14} Mother also offered evidence in support of her claim that father was not providing proper medical care. For example, mother submitted a medical-visit summary from B.B.'s physical on September 2, 2023, stating that the doctor had recommended a follow-up in six months to address hormonal and development concerns, "as dad denied referral." The summary goes on to say that B.B. "[n]ever came to app[ointment]t," so the doctor provided a "referral to [an] Endo[crinologist] for evaluation . . . per mother request." Another medical-visit summary described father taking B.B. to the endocrinologist "with mom on speaker phone" on September

28, 2023. This summary also notes that B.B. expressed some "concern . . . in going home with dad," though the context for this sentence is not clear from the printout. A September endocrinology summary stated that B.B. should follow up in six months. But mother submitted a screenshot of her MyChart phone application, which showed that had B.B. missed an endocrinology appointment in March 2024.

{¶15} Mother expressed similar concerns about R.W. missing medical appointments. She produced a letter from West Side Pediatrics, captioned "1st No Show Letter," which notified the "Parent/Guardian of [R.W.]" that R.W. had missed a doctor's appointment on June 19, 2023, without notifying the office. And mother noted that, following the November 2023 incident described in the police report, officers had been told that R.W. would be taken to Cincinnati Children's Hospital. But, mother testified, father did not take R.W. to Children's; instead, they went to West Side Pediatrics the same day. A report from the West Side Pediatrics visit states that, despite concerns about R.W.'s left ear, the doctor could not examine it due to R.W.'s "agitation and aggression." Finally, mother introduced a doctor-visit summary from October 2024 stating that father had declined a second dose of the HPV vaccine for R.W., as well as COVID and influenza vaccines.

{¶16} Following the January 2025 hearing, the magistrate conducted an in-camera interview with B.B.[1]

### C. Decision, Objections & Judgment

{¶17} The magistrate denied mother's motion to modify the prior custody order, because he found that no change in circumstances justified a change in custody under R.C. 3109.04(E)(1)(a). First, the magistrate held that father's denial of

---

[1] We have reviewed the sealed transcript from this interview, but, like the magistrate and juvenile court, decline to summarize its contents.

parenting time to mother during the preceding year could not justify reallocating custody, because father had not been required to allow mother parenting time following the 2021 decision. Second, the magistrate did "not find after a review of the testimony and evidence presented there is sufficient evidence to substantiate Mother's allegations of abuse against the children."

{¶18} The magistrate *did* find some evidence of "alleged medical neglect," but only to the extent that "Father has failed to follow up with some medical appointments," the necessity and consequences of which mother failed to establish. The magistrate also "considered the injuries depicted in the pictures in considering whether there is reason to believe Father has acted in a manner resulting in a child being an abused or a neglected child," but did not find that the possibility of neglect amounted to a change in circumstances for statutory purposes.

{¶19} After denying the motion to modify custody, the magistrate also found that an alteration of the parenting-time order was not in the children's best interest under R.C. 3109.051(D).

{¶20} Mother filed objections to this decision. She contended that the magistrate had not adequately considered father's alleged medical neglect and the prior allegations of abuse against father. The juvenile court held a hearing, at which father appeared, and then overruled mother's objections and approved the magistrate's decision. In explaining its decision, the juvenile court first stated it deferred to the magistrate's credibility determinations, then found that the magistrate's decision was supported by the weight of the evidence and in accordance with law. After conducting its independent review, the juvenile court concluded that "the testimony presented and evidence admitted [were] insufficient to show a sufficient change of circumstances" to warrant a change in custody. And, like the

magistrate, the juvenile court found that the best-interest factors cut against changing the parenting-time order.

## II. ANALYSIS

**{¶21}** Mother appeals the juvenile court's order. Her sole assignment of error attacks only the portion of the juvenile court's order declining to grant her full custody, and does *not* challenge the portion denying her motion to modify or reinstate parenting time.[2] Father has not filed a responsive brief.

**{¶22}** Custody determinations do not extinguish a noncustodial parent's parental rights. Rather, a noncustodial parent retains residual rights, including the right to seek modification or termination of the legal-custody order. *In re J.S.,* 2024-Ohio-4887, ¶ 13 (1st Dist.), citing *In re R.G.M.*, 2024-Ohio-2737, ¶ 16.

**{¶23}** Because the General Assembly has entrusted the context-sensitive task of apportioning rights and duties among parents and custodians to the juvenile court's sound discretion, our review is limited to asking whether the court abused that discretion. *In re J.S.* at ¶ 14. A trial court abuses its discretion when its decision or reasoning process is unreasonable, arbitrary, or unconscionable. *Id.* at ¶ 14; *State v. Beasley*, 2018-Ohio-16, ¶ 12. A juvenile court's legal-custody determination is unreasonable, arbitrary, or unconscionable if the court's findings "are not supported by competent and credible evidence." *In re J.S.* at ¶ 14.

### A. Applicable Statute

**{¶24}** B.B. and R.W. were adjudicated dependent, and father was initially awarded legal custody pursuant to R.C. 2151.353(A)(3). R.C. 2151.42(B) governs a

---

[2] Mother's full assignment of error reads as follows: "The trial court erred in the courts [sic] abuse of discretion by not granting Mother full custody. The trail [sic] court's decision in this case was unreasonable because it ignored substantial evidence and placed both children especially a non-verbal disabled child, R.W. and B.B. at continuous risk."

request to "modify or terminate" an "order of disposition under division (A)(3) of section 2151.353 . . . of the Revised Code granting legal custody of a child to a person." The juvenile court analyzed mother's motion for custody under R.C. 3109.04. This was incorrect. R.C. 3109.04(E) governs only the modification of a prior "decree allocating parental rights and responsibilities for the care of children" issued as part of a divorce, separation, annulment, or similar proceeding. *See* R.C. 3109.04(E)(1)(a); *see also* R.C. 3109.04(A), (D)(1)(d), and (L)(2). But when a juvenile court adjudicates a child "abused, neglected, or dependent," it does not award custody as part of a "decree," as described in R.C. 3109.04, but as part of an "order[] of disposition" under R.C. 2151.353(A) and 2151.35(B)(3). This court has squarely held that R.C. 2151.42(B)—*not* R.C. 3109.04(E)—applies when seeking to modify a legal-custody award in such a dispositional order. *See In re B.J.*, 2009-Ohio-6485, ¶ 20 (1st Dist.).

{¶25} Under R.C. 2151.42(B), a juvenile court may not "modify or terminate" a dispositional order awarding legal custody "unless it finds, based on facts that have arisen since the order was issued or that were unknown to the court at that time, [1] that a change has occurred in the circumstances of the child or the person who was granted legal custody, and [2] that modification or termination of the order is necessary to serve the best interest of the child." Although these two requirements bear a striking similarity to the requirements set forth in R.C. 3109.04(E)(1)(a), they differ in four important ways.

{¶26} *First*, R.C. 2151.42(B) limits *whose* changed circumstances a court may consider. Under R.C. 3109.04(E)(1)(a), a court can consider changes in "the circumstances of the child, the child's residential parent, *or either of the parents subject to a shared parenting decree.*" (Emphasis added.) R.C. 2151.42(B) omits

nonresidential/noncustodial parents from its list and refers only to changes in "the circumstances of the child or the person who was granted legal custody." Thus, we have said that under R.C. 2151.42(B) a juvenile court must "limit[]" its "change-in-circumstances determination to two individuals: (1) 'the child' or (2) 'the person who was granted legal custody.'" *In re B.J.* at ¶ 18, quoting R.C. 2151.42(B).

{¶27} *Second*, R.C. 2151.42(B) provides that a disposition order awarding legal custody under R.C. 2151.353(A)(3) is "intended to be permanent in nature." This presumptive permanency "furthers the legislative policy of providing stability and security for children and preventing arbitrary or frequent changes in custody." *In re R.G.M.*, 2024-Ohio-2737, at ¶ 22. R.C. 3109.04(E)(1)(a) contains no similar language. *See In re James*, 2007-Ohio-2335, ¶ 26 (noting that such language "does not appear in R.C. 3109.04(E)(1)"). Instead, R.C. 3109.04(E)(1)(a)(iii) permits a change of residential parent if, in light of the changed circumstances, (1) the "harm likely to be caused by a change of environment is outweighed by the advantages of the change of environment to the child" and (2) the change would be in the child's best interest. By imposing a presumption of permanency in R.C. 2151.42(B), rather than allowing for a change of custody if the benefits outweigh the harms, the General Assembly has placed an *additional* thumb on the scale in favor of a prior custody disposition under R.C. 2151.353(A)(3). *See In re James* at ¶ 26 (noting that R.C. 2151.42 "is more compelling on the issue of permanency than is R.C. 3109.04(E)(1)").

{¶28} *Third*, R.C. 3109.04(E) allows a court to modify a decree designating a residential parent (i.e., awarding legal custody) based on the current residential parent's consent or the child's integration into a nonresidential parent's family, so long as the change would be in the child's best interest. *See* R.C. 3109.04(E)(1)(a)(i) and (ii). R.C. 2151.42 contains no comparable provisions permitting modification of a

dispositional order based on consent or familial-integration.

**{¶29}** *Fourth*, unlike R.C. 3109.04(E)(1)(a), which requires a court to consider the factors in R.C. 3109.04(F) when making best-interest determinations, R.C. 2151.42 includes no list of best-interest factors. This and other courts have therefore held that a "juvenile court may look to the factors in R.C. 2151.414(D)(1) or 3109.04(F) for guidance." *In re J.S.*, 2024-Ohio-4887, at ¶ 11 (1st Dist.), citing *In re M/E*, 2021-Ohio-450, ¶ 19 (1st Dist.); *accord In re R.P.*, 2025-Ohio-656, ¶ 26 (4th Dist.).

### B. Changed Circumstances

1.

**{¶30}** Mother's argument below rested on three alleged changes in the circumstances: (1) father's decision to deny her time with the children, (2) father's alleged abuse of the children, and (3) father's alleged medical neglect of the children. The magistrate rejected all three arguments and held that there had not been a change in circumstances sufficient to warrant modifying custody. The juvenile court approved that decision, and we now hold that it did not abuse its discretion in doing so.

**{¶31}** *First*, the magistrate and juvenile court rejected the premise that mother could gain custody based on father's decision to deny her parenting time, because mother was *not legally entitled* to parenting time. Her court-ordered parenting time had been suspended in 2021, so any parenting time she had been receiving was at father's discretion. We cannot say that the juvenile court abused its discretion by finding that these were not changed circumstances sufficient to modify the prior custody disposition.

**{¶32}** *Second*, the magistrate found insufficient evidence to substantiate mother's allegations of physical abuse against the children. The juvenile court did not abuse its discretion in adopting this finding.

11

{¶33} We have reviewed mother's testimony and the magistrate's in-camera interview with B.B. We have also reviewed the photographs in evidence, which do show some concerning injuries on R.W.'s arms, legs, and chest. But there is no admitted evidence that father has physically abused B.B. or R.W. since becoming involved with HCJFS. Nor is there record evidence of how R.W. experienced these various injuries. Nor does the record contain evidence explaining the degree to which such injuries might be unavoidable or expected for individuals with disabilities like R.W.'s, even when adequately supervised.

{¶34} The same is true of the images purporting to show R.W. with feces on his person. The worst of these images were captured while R.W. was in father's care, but we have little context for what led to them. At the hearing on mother's objections to the magistrate's decision, father acknowledged (although not under oath) that R.W. had gone "through a phase of playing with his poop" during which he would "pull[] it out, put it on the wall, put it in his hair." Without further evidence that these incidents led to health consequences or lasted long enough to constitute obvious neglect, we cannot say that the juvenile court was obligated to find that father had abused or neglected R.W.

{¶35} Given the magistrate's opportunity to see and interview the witnesses, including mother, and given the magistrate's familiarity with the case, we cannot say the juvenile court abused its discretion when it adopted the magistrate's finding that the children were not subjected to abuse while in father's care.

{¶36} *Third*, the magistrate did credit mother's evidence suggesting that father had "failed to follow up with some medical appointments." The magistrate concluded, however, that this did not demonstrate a sufficient change in circumstances because mother "failed to establish the necessity of the follow up

appointments, or that the child[ren] have suffered ill effects of the missed follow up appointments." The juvenile court did not disturb this finding.

{¶37} The juvenile court did not abuse its discretion in holding that father's failure to follow up with some medical appointments did not constitute a change in circumstances sufficient to warrant an adjustment of legal custody. Father did apparently miss several appointments. Nevertheless, the children seem to regularly see their doctors. And while the small number of appointments missed did involve some important developmental issues, they did not concern obviously life-threatening maladies. Without evidence of significant stakes or consequences, the magistrate could reasonably conclude that these few missed appointments could not amount to a change in circumstances sufficient to warrant modifying the custody order.

2.

{¶38} The juvenile court's factual determinations were neither arbitrary nor unreasonable. However, as we have already explained, those determinations were made under the wrong standard. Still, we cannot say that this constituted reversible error in this case because application of the proper standard would, if anything, have made mother's task below even *harder*.

{¶39} As we have already explained, R.C. 2151.42(B) places an additional thumb on the scale in favor permanency. Because the magistrate and juvenile court applied R.C. 3109.04(E)(1)(a)(iii), they necessarily found that mother had failed to show that, due to changed circumstances, "[t]he harm likely to be caused by a change of environment [was] outweighed by the advantages of the change of environment to the child." That bar was *lower* than the one imposed by R.C. 2151.42, which, as explained above, "is more compelling on the issue of permanency than is R.C. 3109.04(E)(1)." *See In re James*, 2007-Ohio-2335, at ¶ 26. The juvenile court

could not logically have found that mother had failed to meet her burden under R.C. 3109.04(E)(1)(a)(iii), but nevertheless believed she could have overcome the presumption in favor of permanency under R.C. 2151.42.

{¶40} Accordingly, we hold that the juvenile court did not err in denying mother's motion to modify custody, notwithstanding its application of the wrong statutory standard.

### III. CONCLUSION

{¶41} Without a sufficient change in circumstances there can be no modification of custody under R.C. 2151.42(B)—and the juvenile court reasonably found no change in circumstances here. We therefore overrule mother's sole assignment of error without needing to address any best-interest factors. And because mother's assignment of error dealt only with the portion of the juvenile court's order concerning custody, we need not address its denial of her motion for additional parenting time. The judgment of the juvenile court is therefore affirmed.

Judgment affirmed.

**ZAYAS, P.J.,** and **BOCK, J.,** concur.